UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFFREY L. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:15-cv-01321-RLY-MPB |
| | ) | |
| NTN DRIVESHAFT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Jeffrey L. Jackson is a Seventh-Day Adventist who has a sincere religious practice of observing the Sabbath from sundown on Friday until sundown on Saturday. According to his church's religious teachings, he should refrain from work during this period. This presented a problem for Jackson because his employer, NTN Driveshaft, Inc., required him to work Saturday overtime shifts. He therefore sought (and obtained) a religious accommodation that allowed him to observe the Sabbath if he found a replacement for his shifts. Almost one year later, Human Resources Supervisor Duane Roberts terminated Jackson for excessive absences. Two of the relevant absences were for Sabbath shifts; one was not.

NTN now concedes that Roberts made a mistake–Jackson should not have been fired. But it invokes the honest-belief doctrine: Roberts genuinely thought that Jackson had violated the company's attendance policy, and that was the only basis for his decision to terminate. In other words, Roberts made an unfortunate mistake, but his error was not unlawful or discriminatory.

1

Jackson, on the other hand, maintains that he has been treated unfavorably solely because of his religion. He brings three claims, all under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*: (1) failure to accommodate, (2) religious discrimination, and (3) retaliation. NTN now moves for summary judgment on all counts. Because a reasonable jury could return a verdict for Jackson on each claim, NTN's motion must be **DENIED**.

**I. Legal Standard**

"Summary judgment is proper where, construing facts and drawing inferences in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Novoselsky v. Brown*, 822 F.3d 342, 348-49 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

**II. Failure to Accommodate**

Title VII "require[s] an employer to make reasonable efforts to accommodate the religious practices of employees unless doing so would cause the employer undue hardship." *Porter v. City of Chi.*, 700 F.3d 944, 951 (7th Cir. 2012). Pursuant to the Supreme Court's recent decision in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015), a plaintiff bringing this type of claim must show: (1) his religious belief or practice conflicted with an employment requirement, and (2) his need for an accommodation of that religious belief or practice was a motivating factor in the employer's adverse employment decision. *Summers v. Whitis*, No. 4:15-cv-00093-RLY-DML, 2016 U.S. Dist. LEXIS 173222, at *11 (S.D. Ind. Dec. 15, 2016). If an employee makes this initial showing, the employer can (1) rebut one or more elements of the claim,

2

(2) show that it offered a reasonable accommodation, or (3) show that an accommodation of the employee's religious needs would result in undue hardship. At summary judgment, the court must determine if a reasonable jury could find for Jackson.

The court holds Jackson has presented sufficient evidence to stave off summary judgment. First, there is no dispute he maintained a religious practice that conflicted with an employment requirement. As a member of the Seventh-Day Adventist Church, Jackson has a sincere religious practice of observing the Sabbath. (Filing No. 82-34, Declaration of Jeffrey Jackson ¶ 1). He believes that he should refrain from work from sundown on Friday until sundown on Saturday. (*Id.*). But, due to high production demand, the forge plant where Jackson worked "was a seven-day-a-week operation" during the relevant years. (Filing No. 82-43, Deposition of Duane Roberts 43:12-18). Employees were required to work overtime on the weekends. (Filing No. 74-2, Deposition of Jeffrey Jackson 75:23-76:4; Jackson Dec. ¶ 4). A policy of mandatory Saturday overtime objectively conflicts with religious observation of the Sabbath.

For the second element, Jackson shows that there is a dispute of material fact as to whether his need for a religious accommodation was a motivating factor in the decision to terminate him. He first requested an accommodation on April 25, 2013 through his pastor. (Filing No. 82-20, First Request for Accommodation). NTN offered the following accommodation: Jackson could avoid working on any scheduled Saturday shift if he found a qualified replacement to work for him. (Filing No. 82-27, Accommodation). If Jackson could not find a qualified replacement, he would need to use a vacation day or a personal day, which NTN calls "occasional absence" (OA) time.

NTN annually provides each employee with five OA days. This means that an employee can accrue five unscheduled absences each year and not suffer any discipline. Once OA time has been depleted, he is given a verbal notice that additional absences will result in attendance points. The first absence after an employee exhausts his OA time results in a written warning and one attendance point. The second absence results in a final written warning and a second attendance point. The third absence results in a third attendance point and termination of employment. These points reset to zero when OA days are reloaded (i.e., once each year). (*See generally* Filing No. 82-30, Employee Handbook).

Roberts testified that his decision to terminate "was based exclusively on [his] honest belief that Plaintiff had accumulated the terminal number of points (3) under NTN's attendance policy." (Filing No. 74-7, Declaration of Duane Roberts ¶ 5).[1] It appears that this belief was mistaken in two distinct ways. First, Roberts relied on a flawed attendance report. This error stemmed from the fact that the two systems NTN uses to track attendance conflict on Jackson's record. (*Compare* Filing No. 82-3, Attendance Counts Report *with* Filing No. 82-5, ADP Report). Put simply, the ADP Report had Jackson closer to termination than the Attendance Counts Report. Roberts primarily relied upon the ADP Report in making his decision, (Roberts Dep. 252:12-15),

---

[1] Pursuant to Local Rule 56-1(i), Jackson included a motion to strike this declaration within his response brief. Jackson argues that Roberts' declaration cannot be considered because he only provides conclusory assertions. The court disagrees and therefore **DENIES** the motion.

but, in retrospect, NTN recognizes that the Attendance Counts Report was more accurate. (*See* Filing No. 74-1, Declaration of Kathy Littleton ¶¶ 9-11).[2]

Jackson highlights another error though: both reports plainly reveal that he had OA time remaining when he was fired.[3] According to NTN's own records, Jackson had either one or three OA days remaining when he began earning attendance points. (*See* Attendance Counts Report (three days); ADP Report (one day)). So even if Roberts thought the ADP Report was accurate, he could not have rationally concluded that terminating Jackson was justified by company policy. Jackson also points to a handwritten notation on his ADP Report that states, "4 OA 2 ABS." (ADP Report at 9). If Jackson is to be believed, this note proves NTN understood he had used four OA days and had been assigned two attendance points when he was terminated.

NTN does not concede this specific error. Rather, Roberts offered a different explanation for this note in his deposition. He testified that Jackson "overdipped" one OA day in the previous period, so NTN only provided him with four OA days instead of the usual five. (Roberts Dep. 247:15-248:14). If true, this would mean Jackson properly began receiving attendance points after using four OA days. But NTN's internal

---

[2] Jackson also moves to strike this declaration. He offers several reasons: lack of personal knowledge, lack of foundation, hearsay, conclusory assertions without sufficient detail, and failure to disclose Littleton as a witness. The court summarily rejects these arguments and **DENIES** the motion.

[3] The parties also discuss whether Jackson had available vacation days, but this is not material to the present motion. NTN's Employee Handbook provides that employees must request permission to use a vacation day at least "24 hours prior to the desired time off," (Employee Handbook at 14), but Jackson does not allege that he ever submitted such a request for the dates at issue. While Jackson is correct that a supervisor can allow an employee to use a vacation day even if he fails to provide adequate notice, this choice is wholly within the supervisor's discretion. (Roberts Dep. 184:13-17, 244:8-13).

5

presentation on its attendance policy suggests that "overdipping" OA days cannot occur. (*See* Filing No. 82-36, OA Policy Presentation at 4). Rather, if an employee is absent from work after using all of his OA time, he should be assessed an attendance point. At the very least, there is a dispute of fact on this point.

Along with those two mistakes, Jackson emphasizes that the decision to terminate him was flawed in other ways. Specifically, he alleges that Roberts ran afoul of NTN's warning system when he gave Jackson a verbal warning, first written warning, and final written warning all on the same day. (Jackson Dec. ¶ 21).

Proving that Roberts made a mistake is not enough for Jackson to survive summary judgment though. *See Memon v. W. Tech. Coll.*, No. 16-1814, 2016 U.S. App. LEXIS 22037, at *5 (7th Cir. Dec. 12, 2016) ("[A] mistake does not prove discrimination 'so long as the decision-maker honestly believed the non-discriminatory reason.'") (quoting *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016)). In this case, there is reason to doubt whether Roberts honestly believed Jackson had violated the attendance policy. Roberts testified that he was watching Jackson's time "very, very closely" and even "triple checked" his time to make "absolutely sure" there were no mistakes. (Roberts Dep. 85:16-24; Filing No. 82-23, Email from Roberts). Jackson submits that this claim is simply implausible based on the unambiguous records.

To be sure, there is a discrepancy between Roberts' alleged thoroughness and the OA days mistake. A reasonable jury could find that this discrepancy supports a verdict for Jackson. *See Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1121 (7th Cir. 1999) ("When the sincerity of an employer's asserted reasons for discharging an employee is cast into

6

doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation."). At bottom, this calls Roberts' credibility into question. Credibility, of course, is a matter for the jury, not the court at summary judgment. *See Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 633 (7th Cir. 2009) ("Employment discrimination cases often center on parties' intent and credibility, which must go to a jury unless no rational factfinder could draw the contrary inference.") (quotation marks omitted). Accordingly, there is a genuine dispute as to whether Roberts honestly believed Jackson had accumulated three attendance points.

Jackson connects this dispute of fact to his religion in two separate ways. Initially, the timing is suspicious. After first requesting an accommodation in April 2013, Jackson's pastor submitted a second letter requesting an accommodation on February 21, 2014. (Filing No. 82-21, Second Request for Accommodation). Jackson was then terminated on February 24, 2014, just three days after requesting a religious accommodation.

Second, Jackson also points to his two direct supervisors, Gary Decker and Jim Elkins. Jackson alleges these men frequently made derogatory comments about his religion, such as asking whether the Seventh-Day Adventist Church was "some kind of occult." (Jackson Dec. ¶ 14). They allegedly told him he needed to "make NTN [his] religion" and "worship on the right day." (*Id.*). They also said that if Jackson truly cared about his family, he "would shut up about being off on the Sabbath." (*Id.* ¶ 22). Once Preston Crabtree (the plant manager, and the individual who created the accommodation) left NTN, Elkins and Decker allegedly "told [Jackson] that his religious observances

7

would no longer be accommodated, even if [he] had a suitable replacement." (*Id.* ¶ 18). They were through "messing with [him]." (*Id.* ¶ 22).

NTN avers that the court should disregard the comments from Decker and Elkins because (1) Jackson's declaration contradicts his deposition testimony, and (2) the remarks were not made by Roberts, the undisputed decision maker. First, NTN takes issue with Jackson's sudden ability to remember these comments for the first time in his declaration. It highlights that Jackson testified during his deposition there were no other facts relevant to his case that had not already been discussed. (*See e.g.,* Jackson Dep. 165:1-13). To the extent that there is a contradiction, NTN assigns far too much meaning to it. It is not as if Jackson was directly asked if Decker or Elkins ever made offensive remarks. Instead, Jackson was asked a very broad question: "[A]re there any facts that you believe that are relevant to this claim of religious discrimination that we have not discussed?" (*Id.* 164:2-5). His answer in the negative appears to reflect a lapse in memory, which he later remedied in his declaration. That is generally permissible. As the Seventh Circuit noted,

> Few honest witnesses testify at any length without at least occasional lapses of memory or needs for correction or clarification. Disregarding as a sham every correction of a memory failure or variation in a witness's testimony requires "far too much from lay witnesses" and would usurp the trier of fact's role in determining which portion of the testimony was most accurate and reliable.

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571-72 (7th Cir. 2015) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)).

8

Second, these comments are relevant even though they did not come from a decision maker. Jackson alleges that on February 22, 2014 (the date he received his final attendance point), he had a replacement working for him. He was terminated nonetheless because Elkins told Roberts that Jackson had no replacement. NTN disputes that Jackson had a replacement, but if a jury believed Jackson about both the comments and his replacement, they could infer that Elkins lied to Roberts in order to ensure Jackson was terminated. Indeed, Jackson testified, "Jim Elkins and Gary Decker told me that . . . if I did not show up to work on Saturday, February 22, 2014, regardless of any available substitute, my employment would be terminated." (Jackson Dec. ¶ 22).

In light of these disputes, this claim must be resolved by a jury unless NTN can prove, as a matter of law, that it offered Jackson a reasonable accommodation or that doing so would have resulted in undue hardship. NTN attempts to satisfy both defenses. First, it claims that courts generally find shift-swapping to be a reasonable accommodation. Jackson retorts that, even if NTN's proposed accommodation is facially reasonable, it was not reasonable as applied to him because it did not work. In other words, Jackson abided by the terms of the agreement, but he was terminated nonetheless. NTN failed to take the necessary steps in order to ensure that the accommodation was implemented correctly. Jackson posits that an employer's religious accommodation cannot be considered reasonable if the employee is fired for simply following its terms. The court agrees, as that suggests the conflict between the employee's religious beliefs and his work was not actually eliminated. For an employer's accommodation to be considered reasonable, it must eliminate the conflict. *See Porter*, 700 F.3d at 951 ("[A]

9

'reasonable accommodation' of an employee's religious practices is one that eliminates the conflict between employment requirements and religious practices.") (some quotation marks omitted).

Next, NTN asserts that Jackson's preferred accommodation (always having the Sabbath off) would result in undue hardship. Jackson, in turn, asserts that he never sought that accommodation. He maintains that NTN would not have suffered an undue hardship from simply following the terms of its own attendance policy and the accommodation it drafted.

NTN has not demonstrated that it is entitled to summary judgment based upon its defenses. A rational jury could reject its claim that it offered a reasonable accommodation based on the fact that it did not eliminate the conflict between Jackson's observation of the Sabbath and NTN's policy of mandatory Saturday overtime. Because a reasonable jury could find that NTN failed to accommodate Jackson's religious beliefs, summary judgment on this claim must be denied.

**III. Religious Discrimination**

Title VII also makes it unlawful for an employer to discriminate against any individual because of his religion. 42 U.S.C. § 2000e-2(a)(1). Jackson alleges that NTN terminated and disciplined him because of his sincerely-held religious beliefs. To avoid summary judgment on this claim, Jackson must convince the court that a reasonable jury could conclude his religion caused the discharge. *Williams v. Office of the Chief Judge*, 839 F.3d 617, 626 (7th Cir. 2016). In light of the discussion above, he has done that here.

**IV. Retaliation**

In addition, Title VII prohibits an employer from retaliating against an employee who engages in statutorily protected activity. 42 U.S.C. § 2000e-3(a). To succeed on this claim, Jackson "must prove that he engaged in protected activity and suffered an adverse employment action, and that there is a causal link between the two." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The court's inquiry at summary judgment is straight-forward: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?" *Id.*

Initially, NTN argues that Jackson may not pursue this claim because he failed to mark the retaliation box on his EEOC charge. NTN construes this as a failure to exhaust administrative remedies. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992) ("An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination."). "To be cognizable in federal court, a Title VII claim must simply be like or reasonably related to the allegations of the charge and growing out of such allegations. The relevant claim and the EEOC charge must, at a minimum, describe the same conduct and implicate the same individuals." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 831-32 (7th Cir. 2015). In applying this standard, the court reviews Jackson's EEOC charge "liberally." *Id.* at 831.

Jackson's retaliation claim is reasonably related to the allegations in his EEOC complaint. In his charge, Jackson describes requesting an accommodation from Roberts,

11

and yet still receiving discipline from Elkins and Decker for not working on Saturdays. (Filing No. 1-1, EEOC Charge at 1). Jackson also claimed that he was "terminated allegedly due to attendance even though [he] had secured replacements for all of [his] scheduled Saturday shifts." (*Id.* at 2). His EEOC complaint describes the same conduct and implicates the same individuals as his retaliation claim. Therefore, Jackson did not fail to exhaust his administrative remedies.

Turning to the substance of this claim, the court finds that, based on the discussion above, Jackson has marshaled enough evidence to convince a jury that NTN retaliated against him. The suspicious timing is particularly relevant to this claim. Jackson's termination occurred on February 24, 2014, just a few days after his second request for accommodation. While there is a significant gap in time between the termination and the first request, the discharge followed "close on the heels" of the second request. *Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). This is enough to stave off NTN's motion for summary judgment. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015) ("Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment.").

**V. Punitive Damages**

Lastly, as an argument in the alternative, NTN contends that the court should take punitive damages off of the table before this case goes to trial. "A complaining party may recover punitive damages in a Title VII case by demonstrating that the employer 'engaged in a discriminatory practice or discriminatory practices with malice or with

reckless indifference to the federally protected rights of an aggrieved individual.'" *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016) (quoting 42 U.S.C. § 1981a(b)(1)) (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999)). According to NTN, Jackson cannot satisfy this standard and his demand for punitive damages should consequently be stricken.

The court finds that the record, when examined in the light most favorable to Jackson, could support a punitive damages award. A reasonable jury might agree with Jackson's theory of the case and determine that (1) NTN was familiar with anti-discrimination laws, (2) Elkins and Decker, who knew Jackson had requested a religious accommodation, made offensive comments about his religion, (3) Elkins intentionally lied about Jackson having a replacement in order to ensure he was fired, (4) Roberts terminated Jackson even though he knew Jackson still had one OA day left, and (5) Roberts made this decision just days after receiving a letter from Jackson's pastor. That narrative suggests reckless indifference to federally protected rights. *See May v. Chrysler Grp., LLC*, 716 F.3d 963, 974 (7th Cir. 2012) (noting "[n]o evidence of 'egregious' or 'outrageous' conduct by the employer is required" to impose punitive damages).

NTN retorts that even if Jackson can satisfy the requisite standard, punitive damages cannot be imposed as a matter of law because it has made a good-faith effort to comply with Title VII. *See id.* ("If May proves that Chrysler acted with the requisite malice or reckless indifference, Chrysler may avoid liability for punitive damages if it can show that it engaged in good-faith efforts to comply with Title VII."). As evidence, NTN submits that it has implemented anti-discrimination policies and provides multiple

avenues for employees to report concerns. This is relevant, but not enough to win the day. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001) ("[A]lthough the implementation of a written or formal antidiscrimination policy is relevant to evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award.").

NTN also asserts that it has a custom and practice of accommodating employees' religious beliefs. HR Supervisor Kathy Littleton testified, "[A]part from the accommodation provided to Plaintiff in this case, NTN currently accommodates the religious practices of employee Lori Mills." (Littleton Dec. ¶ 8). Unfortunately, that one line is the sum total of information in the record about the accommodation for Mills. This bald assertion is not enough to strike Jackson's demand for punitive damages.

None of this is to say that the facts of this case mandate a punitive damages award. All the court now holds is that Jackson's prayer for punitive damages survives summary judgment. NTN may renew its request in the form of a motion for judgment as a matter of law under Rule 50(a) after all the evidence has been presented at trial.

**VI. Conclusion**

Accordingly, NTN's Motion for Summary Judgment (Filing No. 72) is **DENIED**.

Jackson's Motion for Leave to File Surreply (Filing No. 88) is **GRANTED**.

**SO ORDERED** this 10th day of May 2017.

                                                  RICHARD L. YOUNG, JUDGE
                                                  United States District Court
                                                  Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.